## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IM PARTNERS and : | |
| DANIEL E. MARINO : | |
| PLAINTIFFS, : | |
| : | |
| v. : | CIVIL ACTION NO. |
| : | 3:04-cv-1651 (JCH) |
| DEBIT DIRECT LIMITED, : | |
| ET AL., : | SEPTEMBER 29, 2005 |
| DEFENDANTS. : | |

### RULING RE: DEFENDANTS' MOTIONS TO DISMISS [DKT. NOS. 28 and 30]

The plaintiffs, IM Partners and its general partner Daniel E. Marino, bring this

action against defendants Debit Direct Limited ("Debit Direct"), Jack O'Halloran, David

Butterworth, Michael Kelly, Skanco Business Systems Limited ("Skanco"), Barry

Kennedy, Restart Limited ("Restart"), Ian Lloyd, Andrew Kermode, Domicilium (IOM)

Limited, John Allen, and Patrick Walsh, alleging violations of section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and various state law

claims.[1]  15 U.S.C. § 78a et seq., 17 C.F.R. § 240.10b-5.  Jurisdiction is predicated

upon 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.  Defendants Debit Direct,

Butterworth, Kelly, Skanco, Kennedy, Restart, Lloyd, and Kermode move to dismiss the

plaintiffs' suit pursuant to Fed.R.Civ.P. Rules 12(b)(2) for lack of jurisdiction, 12(b)(5) for

insufficient service of process, and 12(b)(6) and 9(b) for insufficient pleading.

Defendant O'Halloran moves separately to dismiss the plaintiffs' suit pursuant to Rules

12(b)(6) and 9(b).  For the foregoing reasons, the defendants' motions are GRANTED

---

[1]  In their response to the defendants' motions, the plaintiffs concede the
dismissal of the plaintiffs' second cause of action brought under the Connecticut Unfair
Trade Practices Act ("CUPTA"), §§ 42-110a et seq.  The plaintiffs' CUPTA claim is
therefore dismissed.

in part and DENIED in part.

I.    **BACKGROUND**[2]

This suit arises from an investment made by the plaintiffs in Debit Direct, which the plaintiffs allege was induced by the fraudulent conduct of some of the defendants. IM Partners is a Connecticut partnership with its principal office in Stamford, Connecticut, and Marino, a Connecticut resident, serves as IM Partner's general partner.  The moving defendants are all persons or corporations that reside in the Isle of Man and that have their principal places of business in the Isle of Man.  Debit Direct was, at all relevant times, controlled and directed by O'Halloran, Butterworth, and Kelly, who also served as shareholders, agents, officers, directors, and employees of Debit Direct (hereinafter the "Debit Direct defendants").  Kennedy, with Butterworth, controlled and directed Skanco and Restart, and Lloyd and Kermode were officers or employees of Restart.

In October 2003, Marino was approached in the Isle of Man by O'Halloran. O'Halloran solicited Marino to invest in Debit Direct, and made " oral representations" about the potential for success of the proposed business of Debit Direct, the "integrity and qualification of himself and Butterworth and Kelly, and the ability of the defendants to "assure the success" of Debit Direct. Compl., ¶ 44.

On October 27, 2003, O'Halloran visited Marino in Stamford and made further

_____

[2]  The court takes the facts alleged in the plaintiffs' complaint as true, as it must, and draws all inferences in the plaintiffs' favor.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).  The affidavit materials submitted in response to the defendants' motions to dismiss are considered only in relation to the jurisdictional issues and do not inform this recitation of the facts, which are drawn only from the complaint itself.

representations regarding the "potential for success" of Debit Direct.  Id. at ¶ 45.

Subsequently, O'Halloran, Butterworth, and Kelly contacted Marino and his partners on

numerous occasions, as "officers and directors" of Debit Direct,[3] making "further

representations" about the prospects of Debit Direct.

On November 17, 2003, Marino, on behalf of IM Partners, executed a

Memorandum of Understanding in Stamford that was also signed by O'Halloran,

individually and on behalf of Debit Direct.  The Memorandum of Understanding stated

that "IM and O'Halloran desire to invest and participate in a joint venture with respect to

Debit Direct" and that the parties "desire to move ahead with said joint venture while the

formalities and documentation are finalized describing the transaction in detail."  Id. at

Ex. 1.  The Memorandum provided that IM Partners would invest the sum of

$2,000,000, specified as "US Dollars," in return for 45% of the outstanding shares of

Debit Direct.  O'Halloran agreed to "use his best efforts, in a reasonable and prudent

manner, subject to the approval of Debit Direct Board of Directors and IM's approval, to

preserve existing business relationships and obtain new business and business

relationships for the sole benefit of Debit Direct in order to facilitate the growth of Debit

Direct."  Id.  The Memorandum also stated that it "sets forth an agreement in principle

only and is not binding on the parties hereto and may not be relied upon as the basis of

a contract by estoppel."  Id.

According to the plaintiffs, who did not specify when this particular representation

---

[3] It is unclear from the plaintiffs' complaint whether Debit Direct was an ongoing
concern prior to Marino's investment in it or whether it was only a proposed venture at
the time of the plaintiffs' investment.

occurred, O'Halloran, Butterworth, and Kelly represented to the plaintiffs that the total investment of USD $2,000,000 would be sufficient to "assure the success of the proposed business of Debit Direct." Id. at ¶ 49.  In accordance with the Memorandum of Understanding, and based upon the representations that had been made by the Debit Direct defendants, the plaintiffs wired a total of USD $2,000,000 to Debit Direct in November 2003 and March 2004.

The plaintiffs argue that the transfer of funds from IM Partners to Debit Direct caused a fiduciary relationship to be formed between IM Partners and the Debit Direct defendants, and that the defendants breached their fiduciary duties by failing to disclose to the plaintiffs several material facts, and by entering into self-serving transactions with the other defendants, that adversely affected Debit Direct and, consequently, IM Partners.  The plaintiffs claim that O'Halloran did not disclose that he had previously been banned from serving as a director of any Irish company by the government of Ireland, and that this was a material fact that the defendants concealed from the plaintiffs with the intent to defraud the plaintiffs.  In addition, the plaintiffs claim that the defendants knew and with fraudulent intent did not disclose to the plaintiffs, at the time that IM Partners executed the November Memorandum of Understanding and at the time that IM Partners transferred funds to Debit Direct, that USD $2,000,000 would not in fact be sufficient to complete the development of Debit Direct.  The Debit Direct defendants also did not disclose to the plaintiffs that the defendants had caused Debit Direct to enter into non-arms-length transactions with Skanco and Restart, both of which were controlled in part by Butterworth, from which the Debit Direct defendants personally profited.

-4-

On April 20, 2004, the Direct Debit defendants, with Walsh, visited Stamford again and requested an additional investment of USD $2,500,000 from IM Partners, explaining that the November 17, 2003 Memorandum "mistakenly" stated the investment amount in American dollars instead of British pounds, and that the original investment of USD $2,000,000 was insufficient for the development of Debit Direct. According to the plaintiffs, at the April meeting, O'Halloran also made reference to his relationship with a "world renowned mafia boss" and reminded Marino that IM Partners "had better consider who they were dealing with in considering whether to make the additional investment." Compl., ¶ 67.

In June 2004, IM Partners decided not to provide further funding to Debit Direct and attempted to rescind the previous transactions by requesting that Debit Direct return the original $2,000,000 investment. In response, Butterworth informed IM Partners that, if it did not provide the additional $2,500,000, Skanco, under terms of a contract that had not been disclosed to the plaintiffs, would seize all of the assets of Debit Direct, and IM Partners would receive no interest or benefit from their original investment.

On the basis of the foregoing, the plaintiffs allege that O'Halloran, Butterworth, Kelly, Kennedy, and Skanco conspired to create Debit Direct for the purpose of diverting funds intended for investment in Debit Direct for their own benefit and gain through the use of "dummy" corporations, and fraudulently induced IM Partners to invest in Debit Direct. The plaintiffs allege causes of action for the violation of section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), violation of the Connecticut Uniform Securities

Act ("CUSA"), rescission and restitution, unjust enrichment, fraud and conspiracy to defraud related to stock transactions, negligent misrepresentation, breach of fiduciary duty relating to stock transactions, breach of the implied covenant of good faith and fair dealing, and seek, in addition to monetary damages, the imposition of a constructive trust and declaratory relief.

## II.    DISCUSSION

### A.    Service of Process

Defendants Debit Direct, Kelly, Skanco, Restart, Lloyd, and Kermode challenge the service of process they received under Fed.R.Civ.P. Rules 4 and 12(b)(5), arguing that the service was insufficient under the conditions set forth in the November 15,1965 Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil Or Commercial Matters, 20 U.S.T. 361, 658 U.N.T.S. 163 ("Hague Convention").

Parties are bound to effect service pursuant to the Hague Convention in countries that are parties to the treaty.  Rule 4(f) provides,"[u]nless otherwise provided by federal law, service upon an individual . . . may be effected in a place not within any judicial district of the United States: (1) by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention." Fed.R.Civ.P. Rule 4(f).  The Supreme Court has held that the methods of service prescribed by the Hague Convention are mandatory where service abroad to a person in a signatory country is required.  See Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988)("By virtue of the Supremacy Clause, U.S. Const., Art. VI, the Convention pre-empts inconsistent methods of service prescribed by state law in all

cases to which it applies.").

The defendants argue that the plaintiffs did not properly effect service under the terms of the Hague Convention.  Under the Convention, signatory countries are obligated to designate a central authority that receives requests for service from other signatories.  Hague Convention, Art. 2.  Article 10 of the Hague Convention also provides that, if the state of destination does not object, alternative methods of service may be used, such as service "by any person interested in a judicial proceeding . . . directly through judicial officers, officials, or other competent persons of the State of destination."  Id., Art. 10(c).  The defendants argue that the United Kingdom's declaration regarding the Hague convention, which, by its own terms, applies to the Isle of Man, constitutes an objection that precludes the plaintiffs from serving process on the defendants directly.  Id., United Kingdom Declaration, Annex.  The United Kingdom's declaration reads in part: "[w]ith reference to the provisions of paragraphs (b) and (c) of Article 10 of the Convention, documents sent for service through official channels will be accepted in a territory listed in the Annex by the designated authority and only from judicial, consular, or diplomatic officers of other Contracting States."  Id., United Kingdom Declaration, (2)(d).

The defendants argue this statement is a complete rejection of the direct service contemplated in Article 10 of the Convention.  However, American courts have consistently interpreted this declaration not as an categorical objection to Article 10, but only as an objection regarding "documents sent for service through official channels," which have been defined as "documents from an embassy or consular official."  Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd., 106 F.R.D. 595, 596 (E.D.Mo. 1985);

see also Koehler v. Dodwell, 152 F.3d 304, 307 (4th Cir. 1998)(citing Tax Lease Underwriters); Balcom v. Hiller, 46 Cal.App.4th 1758, 1764-65 (1996)(same); White v. Ratcliffe, 285 Ill.App.3d 758, 767 (1996)(citing Balcom).  Furthermore, a report published by a international, non-governmental organization on private international law states that the United Kingdom itself has indicated that it did not intend, under its declaration to the Hague convention, to preclude direct service under Article 10 by English solicitors in the United Kingdom.  Hague Conference on Private International Law, Provisional Version of the New Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, at 62-63, July 2003, available at http://hcch.e-vision.nl/upload/wop/lse_pd01e.pdf.  Thus, the Hague convention does not preclude direct service of process in the United Kingdom (i.e., service that is not made through a central authority), as long as the service of process conforms to the requirements of Article 10.

In each of the cases cited above, service which was made directly by an English solicitor in England was found to be sufficient.  Here, the service was made on the defendants in the Isle of Man by the Coroner of Middle Sheading.  However, a cursory review of the statutory law of the Isle of Man suggests that, under Manx law, a coroner is a judicial officer or otherwise competent person for purposes of Article 10 of the Hague Convention.  See e.g., International Criminal Court Act, IOM Act 2003-9, § 28(1)(2)(2003) (Isle of Man) ("The Attorney General may direct a coroner to serve the document personally on that person."); Licensing Act, IOM Act 1995-8, § 57(1)(e)(ii)(1995) (Isle of Man) ("a coroner in the execution of any process or order of a

court"); Companies Act, IOM Act 1931-1, § 253(3)(1931) (Isle of Man) ("In this section

. . . the expression 'coroner' includes any officer charged with the execution of a writ or

other process."); Customary Laws Act, IOM Act 1422-1, § 49(1422) (Isle of Man)

("Therefore be it ordained that at the next Court after Midsomer the Coroners be made,

and their Names entered into the Rolls of the Court, with the Sume that he taketh for to

serve.").  Therefore, it appears that the service of process made on the Isle of Man

defendants complied with the conditions of the Hague Convention and was thus

sufficient under Rule 4.  Accordingly, the defendants' motion to dismiss pursuant to

Rule 12(b)(5) is denied.

### B.    Personal Jurisdiction

The moving defendants, with the exception of O'Halloran, challenge the

jurisdiction of this court over their persons under Fed.R.Civ.P. 12(b)(2).  "When

responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the

plaintiff bears the burden of establishing that the court has jurisdiction over the

defendant."  Distefano v. Carozzi North America, Inc., 286 F.3d 81, 84 (2d Cir.

2001)(quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779,

784 (2d Cir.1999)).  Where a court relies on pleadings and affidavits in determining

whether jurisdiction exists, "the plaintiff need only make a prima facie showing that the

court possesses personal jurisdiction over the defendant."  Id. (quoting Marine Midland

Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir.1981)).  The pleadings and affidavits are

construed in the light most favorable to the plaintiff, resolving all doubts in his favor.  Id.

Section 27 of the 1934 Exchange Act provides for nationwide jurisdiction for

violations of its securities fraud provisions. 15 U.S.C. § 78aa; see also Kidder, Peabody

& Co., Inc. v. Maxus Energy Corp., 925 F.2d 556, 562 (2d. Cir. 1991)("Jurisdiction is predicated on section 27 of the 1934 Act, which provides for nationwide service of process."). The jurisdiction of the Act extends to foreign non-residents to the extent permitted by the Fifth Amendment due process clause of the United States Constitution. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1340 (2d Cir. 1972)(In regards to section 27, "Congress meant to assert personal jurisdiction over foreigners not present in the United States to but, of course, not beyond the bounds permitted by the due process clause of the Fifth Amendment.").

To accord with the demands of due process, a non-resident defendant must have "certain minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Wash., Office of Unempl. Comp. and Pl., 326 U.S. 310, 316 (1945). "Due process requires that the foreign defendants either have engaged in continuous and systematic activities in the forum or that they have purposefully directed their activities at residents in the form and the litigation results from alleged injuries that arise out of or relate to those activities." FDIC v. Milken, 781 F.Supp. 226, 229 (S.D.N.Y. 1991) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).

The moving defendants can be divided into two groups: those for whom there are no allegations or evidence that they have had personal contact with the United States in connection with the activities giving rise to this suit, and those that have had at least some contact with the United States in connection with the allegations of the complaint. There are no allegations within the plaintiffs' complaint or affidavit materials

that Skanco, Restart, Kennedy, Lloyd, or Kermode had any direct contact with the plaintiffs in Connecticut or any other contact with the forum. The plaintiffs argue that this court has personal jurisdiction over these defendants as they conspired with the Debit Direct defendants and participated in the scheme to defraud the plaintiffs. These allegations, however, are insufficient to create personal jurisdiction over these defendants. See Leasco, 468 F.3d at 1343 ("[T]he mere presence of one conspirator . . . does not confer personal jurisdiction over another conspirator."). Thus, the motion to dismiss for lack of personal jurisdiction is granted as to Restart, Skanco, Kennedy, Lloyd and Kermode.

As to the Debit Direct defendants, the plaintiffs' complaint and affidavits make clear that Butterworth and Kelly (as well as O'Halloran, who has not challenged the court's personal jurisdiction over him), and through them Debit Direct, had at least some contact with the forum jurisdiction through the meetings that were held in Connecticut in relation to the formation and funding of Debit Direct, and through the email and phone communication of the defendants to the plaintiffs in Connecticut. The defendants argue that these contacts were insufficient for due process purposes to confer jurisdiction over them. The plaintiffs argue, in response, that these contacts constitute acts through which the defendants purposefully availed themselves of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," and thus personal jurisdiction over them exists. Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Discussing this standard in Leasco, the Second Circuit listed several bases for the exercise of personal jurisdiction: doing business in the state, doing an act in the

-11-

state, and causing an effect in the state by an act done elsewhere.  <u>Leasco</u>, 468 F.3d at

1340.  The court noted that these principles apply to corporations and reflect "the

modern notions that where a defendant has acted within a state or sufficiently caused

consequences there, he may fairly be subjected to its judicial jurisdiction."  <u>Id.</u>

Based on these principles, the court in <u>Leasco</u> found that jurisdiction existed over

a foreign corporation whose officers had allegedly made fraudulent misrepresentations

concerning the value of the corporation at meetings that occurred within the United

States.  <u>Id.</u> at 1341.  Similarly, here, the Debit Direct defendants allegedly made

fraudulent misrepresentations, on behalf of Debit Direct, at their meetings in the United

States as well as in their communications with the plaintiffs that were directed at the

United States.  Thus, these actions provide a sufficient basis for the exercise of

personal jurisdiction over Debit Direct, Butterworth, and Kelly.[4]

**C.    Sufficiency of the Plaintiffs' Claims**

**1.    <u>Standard of Review</u>**

The defendants challenge the sufficiency of the plaintiffs' pleading under Rule

12(b)(6) and Rule 9(b).  A motion to dismiss filed pursuant to Rule 12(b)(6) can be

granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in

---

[4]  While, as the defendants note, "correspondence and attendance at board meetings" were found to be insufficient to constitute "doing business" or "doing an act" for the exercise of jurisdiction over a foreign corporation in <u>Milken</u>, 781 F.Supp. at 232, the situation in the instant case is inapposite to the one in <u>Milken</u>.  In that case, there was no allegation that the correspondence and board meetings were related to the alleged fraudulent conduct that was the subject of the suit.  <u>Id.</u>  Here, the contacts of the defendants with the forum were activities aimed specifically at securing an investment from the plaintiffs, and thus, it is appropriate to consider them as constituting "doing an act" or "doing business" for personal jurisdiction purposes.

support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  See also Reed v. Town of Branford, 949 F. Supp. 87, 89 (D. Conn. 1996).  In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).  "In considering a motion to dismiss . . . a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference . . . [and review all allegations] in the light most favorable to the non-moving party."  Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996).  Rule 8 of the Federal Rules of Civil Procedure provides that a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).

Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed.R.Civ.P. 9(b). "[T]he complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir.1995) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  "In addition, the complaint should explain how the mis-representations were fraudulent and "plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  Caputo v. Pfizer, Inc.,  267 F.3d 181, 191 (2d Cir.

2001) (citing Connecticut Nat'l. Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987)).

        2.        **Rule 10b-5**[5]

        Plaintiffs assert a claim under section 10(b) of the 1934 Securities Exchange Act,

and Rule 10b-5 thereunder. Section 10(b) and Rule 10b-5 are the general prohibitions

on fraud in the Exchange Act.  Section 10(b) proscribes the use "in connection with the

purchase or sale of any security" of "any manipulative or deceptive device or

contrivance" as defined by the SEC. 15 U.S.C. §78j(b).  Rule 10b-5 makes it

> "unlawful for any person, directly or indirectly, by the use of any means or
> instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange . . .[t]o make any untrue statement of a material fact
> or to omit to state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were made, not
> misleading, or . . . [t]o engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security."

17 CFR § 240.10b-5.

        These provisions are violated when a defendant (1) makes a material

misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

securities."  S.E.C. v. Prater, 289 F.Supp.2d 39, 52 (D.Conn. 2003) (citing S.E.C. v

Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir.1995.  Because violations of

section 10(a) are allegations of fraud, they must be plead with particularity under Fed.

R. Civ. P. 9(b), as well as under the Private Securities Litigation Reform Act of 1995

---

        [5]  The court does not agree with O'Halloran's characterization of the plaintiffs'
suit as a "strike suit," or find that, even if it did describe the suit as such, such
characterization would have concrete consequences for the analysis of the sufficiency
of the plaintiffs' claim under the operative rules of civil procedure.

("PSLRA"), 15 U.S.C.A. § 78u-4(b)(1).  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.

2000).  Scienter, for the purpose of securities fraud, is defined as "a mental state

embracing intent to deceive, manipulate or defraud."  Fezzani v. Bear, Stearns &

Company, 2004 WL 744594, at *14, Fed. Sec. L. Rep. P 92,773 (S.D.N.Y. 2004)

(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).

The moving defendants, including O'Halloran, argue that the plaintiffs have failed

to assert their Rule 10b-5 claim with sufficient particularity under Rule 9(b).  In the

Complaint, the plaintiffs assert that the defendants made "certain representations" for

the purpose of inducing the plaintiffs to invest in Debit Direct, such as representations

about the prospects of Debit Direct, and representations about the required level of

funding for Debit Direct.  For example, the plaintiffs assert that, on October 9, 2003,

O'Halloran made "numerous oral representations respecting . . . the potential for

success of the proposed business of Debit Direct."  Compl., ¶ 44.  This assertion is not

sufficiently specific for the purposes of Rule 9(b).  There are many representations that

can be made about the prospects of a proposed business that, even if the business

turns out not to be successful, are not fraudulent.  The same is true for representations

about required funding for business development.[6]  To meet the requirements of Rule

9(b), as described above, the plaintiffs must plead the content of these affirmative

representations with greater specificity.  Given the manner in which these affirmative

representations are plead, the court cannot conclude, on the basis of the allegations

---

[6] The plaintiffs do plead that the Debit Direct defendants represented that USD
$2,000,000 would be sufficient to assure the success of Debit Direct. Compl., ¶ 49.
This representation would appear to be sufficiently particular in content; however, the
complaint does not specify the time or place that this representation was made.

within the complaint,[7] that the plaintiffs have met the requirements for pleading securities fraud under Rule 9(b).  Therefore, the motion to dismiss the claim with respect to the allegations concerning affirmative representations by the defendants is granted without prejudice to the plaintiffs to replead this portion of their claim.[8]

The plaintiffs also claim that the defendants made material omissions regarding Debit Direct that establish a violation of Rule 10b-5.  In particular, the plaintiffs argue that the defendants' omissions concerning O'Halloran's ban from serving as a director of an Irish company, the funding requirements of Debit Direct, the contracts between Debit Direct and Skanco and Restart, and Butterworth's interest in Skanco and Restart. In order for these omissions to constitute fraud under Rule 10b-5, the plaintiffs must assert facts that demonstrate that the defendants had a duty to disclose material facts to the plaintiffs.  The defendants contend that, if plaintiffs' investment was merely a transaction for shares of Debit Direct stock, then they were not bound by a duty to disclose the alleged material omissions.  See Chiarella v. U. S.,  445 U.S. 222, 228 (1980)("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so.  And the duty to

---

[7]  The plaintiffs have submitted, with their response to the motions to dismiss, affidavit materials that they claim support their assertions of fraudulent conduct on the part of the defendants.  As a 12(b)(6) motion tests only the sufficiency of the claims that are asserted within a complaint itself, these materials have not been considered by the court in relation to the 12(b)(6) portions of the defendants' motions to dismiss.

[8]  The plaintiffs' Rule 10b-5 claim also asserts that there was a "conspiracy to divert funds" that constituted an artifice or scheme to defraud under Rule 10b-5. However, to the extent that the alleged actions of this conspiracy were, in part, the misrepresentations that the court has concluded were not sufficiently plead, the allegation of conspiracy must also be replead.

disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.") The plaintiffs, however, allege that a fiduciary relationship existed between the plaintiffs and the Debit Direct defendants, such that the Debit Direct defendants did have a duty of disclosure to the plaintiffs.  It should be noted that the November 2003 Memorandum of Understanding that was signed by Marino and O'Halloran described the undertaking between the parties as a "joint venture."[9]  Compl., Ex. 1.  Under Connecticut law, "parties to joint ventures undertake fiduciary duties to each other concerning matters within the scope of the joint venture."  Elec. Assocs., Inc. v. Automatic Equip. Dev. Corp., 185 Conn. 31, 35 (1981).  The court cannot therefore conclude, on the basis of the facts alleged in the complaint, that "it appears beyond doubt" that the plaintiffs cannot prove that fiduciary duties existed between the plaintiffs and the moving defendants that would have required the disclosure of material facts.[10]  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Consequently, the motion to dismiss the Rule 10b-5 claim for lack of particularity, to the extent it is premised on the alleged omissions by

_____

[9]  O'Halloran argues that, because the November 2003 Memorandum by its own terms does not provide them with contractual rights, the plaintiffs lack "standing" on which to base their legal claims.  The court does not read the Memorandum so as to preclude the plaintiffs from coming forth with other evidence that it entered into a stock transaction or joint venture with the defendants.

[10]  The court notes that, while the defendants may have owed fiduciary duties to the plaintiffs after the possible formation of a joint venture, it is unlikely, on the set of facts presented by the plaintiffs in their complaint, that the defendants owed the plaintiffs fiduciary duties prior to the formation of the joint venture, or prior to the plaintiffs' investment, that would have required disclosure of some of the alleged omissions prior to the plaintiffs' investment.  The formation of the fiduciary duties owed to the plaintiffs, and the materiality of the alleged omissions, are factual issues that are not appropriate to be resolved on a motion to dismiss.

the defendants, is denied.[11]

The moving defendants also challenge the sufficiency of the plaintiffs' pleading of scienter under Rule 9(b) and 15 U.S.C. § 78u-4(b)(2). To satisfy Rule 9(b) and the PSLRA, a plaintiff's scienter allegations must "give rise to a strong inference of fraudulent intent" which the plaintiff can establish either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal citations omitted).

The plaintiffs have plead that the defendants acted with knowledge of the omissions of material fact, or acted with reckless disregard for the truth, in their failure to disclose material facts to the plaintiffs, as well as in making affirmative mis-representations to the plaintiffs. Compl, ¶¶ 92-93. Recklessness is demonstrated by "conduct which is 'highly unreasonable' and which represents an extreme departure from the standards of ordinary cases . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Livent, Inc. Securities Litigation, 148 F.Supp.2d 331, 349 (S.D.N.Y. 2001). While the plaintiffs' allegations of affirmative misrepresentations have not been plead with sufficient particularity to support a Rule 10b-5 claim, the plaintiffs' allegations can be considered in whole in determining whether they demonstrate circumstantial evidence

---

[11] If the plaintiffs cannot prove that the Debit Direct defendants owed fiduciary duties directly to them, then, as O'Halloran points out, the most appropriate action may be a shareholders derivative suit on behalf of the shareholders of Debit Direct to enforce the duties that the corporate insiders owed to the corporation itself.

of conscious misbehavior or recklessness.  The plaintiffs' allegations, at the very least,

sufficiently demonstrate recklessness on the behalf of the defendants.  For example,

the plaintiffs allege that the defendants claimed that they "mistakenly" requested an

investment of two million U.S. dollars when they meant to ask for two million British

pounds, despite the November Memorandum explicitly stating the plaintiff's investment

in dollars.  While it may have actually been a mistake on the defendant's part, it does

support a finding of recklessness for purposes of the scienter inquiry at the dismissal

stage.  Moreover, the plaintiffs' allegations as a whole demonstrate circumstantial

evidence of an intent to defraud.  The allegations concerning mafia-related threats, if

true, would support an inference of conscious misbehavior.  Thus, the plaintiffs have

sufficiently alleged scienter for purposes of their Rule 10b-5 claim.

### 3.   CUSA Claim

The plaintiffs assert a cause of action under the Connecticut Uniform Securities

Act, Conn. Gen. Stat. § 36b-4 ("CUSA").  The statute provides that:

> [n]o person shall, in connection with the offer, sale or purchase of any
> security, directly or indirectly: (1) Employ any device, scheme or artifice to
> defraud; (2) make any untrue statement of a material fact or omit to state
> a material fact necessary in order to make the statements made, in the
> light of the circumstances under which they are made, not misleading, or
> (3) engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person.

Conn.Gen.Stat. § 36b-4(a).  "To establish liability pursuant to § 36b-4 (a)(2), "the buyer

must prove: (1) that the violator offered or sold a security by means of either an untrue

statement of a material fact, or an omission to state a material fact necessary to make

any statements made, in the circumstances of their making, not misleading; and (2) that

the buyer did not know of the untruth or omission."  Lehn v. Dailey, 77 Conn.App. 621,

630-31 (Conn.App. 2003) (citing <u>Connecticut National Bank v. Giacomi</u>, 242 Conn. 17, 46 (1997)).

The plaintiffs allege that the defendants violated this provision through their conspiracy to divert funds, their material misrepresentations, and their material omissions.  The moving defendants argue that, since CUSA actions sound in fraud, they must be plead in accordance with Fed.R.Civ.P. 9(b).  <u>See</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d Cir. 2004) ("[The wording of Rule 9(b)] is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.").  Thus, for the reasons discussed above, the court finds that the complaint sufficiently alleges CUSA violations on the basis of the defendants' alleged omissions, but that the allegations of affirmative misrepresentations and conspiracy are not sufficiently plead.  As with their Rule 10b-5 claim, the plaintiffs may replead this portion of their CUSA claim without prejudice.

### 4.   <u>Rescission and Restitution</u>

In their fourth cause of action of their complaint, the plaintiffs seek a rescission of the November 2003 Memorandum of Understanding and restitution in the amount of $2,000,000 for their performance under its terms.  The plaintiffs claim that, had it not been for the defendants' fraudulent misrepresentations and omissions of material fact, it would not have entered into the Memorandum of Understanding, and thus rescission and restitution are appropriate remedies.

Rescission is appropriate where a party made "material misrepresentations of fact upon which the [plaintiff] had a right to rely and which induced it to enter into the contract."  <u>State v. Hartford Acc. & Indem. Co.</u>, 136 Conn. 157, 167 (Conn.1949).  "As a

-20-

matter of common law, a party to a contract . . .  may rescind that contract and avoid liability thereunder if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations." Munroe v. Great American Ins. Co., 234 Conn. 182, 188 (Conn.1995) (citing Hartford Acc. & Indem. Co.).

The s' rescission claim is premised on the same allegations of fraud through affirmative misrepresentations and omissions as their Rule 10b-5 claim and their CUSA claim.  Accordingly, for the reasons stated above, the plaintiffs' rescission claim is upheld in part and dismissed in part, and the plaintiffs may replead their claim without prejudice.

### 5.    Unjust Enrichment

The plaintiffs assert a claim for unjust enrichment against the moving defendants, with the exception of Debit Direct itself.  "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Gagne v. Vaccaro, 255 Conn. 390, 408 (2001) (quoting Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215 (1959)).  The elements of the claim are that "(1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment." Kull v. Davidoff of Geneva , No. 01-CIV-4821, 2004 WL 1418088, at 15 (S.D.N.Y. June 23, 2004)(citing Gagne, 255 Conn. at 409).

The plaintiffs have sufficiently alleged that the moving defendants benefitted from their fraudulent actions by diverting the plaintiff's investment in Debit Direct to their

own personal use, and that IM Partners did not receive the benefit of its agreed upon investment in Debit Direct.  Thus, the plaintiffs appear to have sufficiently alleged an action for unjust enrichment.

The defendants argue that unjust enrichment is unavailable as a cause of action to the plaintiffs as it is an equitable remedy and plaintiffs have adequate remedies at law.  See Brown v. Sandimo Materials, 250 F.3d 120, 127 (2d Cir. 2001).  However, because the adequacy of the plaintiffs' legal remedies cannot be determined at the motion to dismiss stage of litigation, the plaintiffs' claims will not be dismissed on this basis.

## 6.   Fraud and Conspiracy to Defraud

The plaintiffs have asserted claims against all of the defendants for common law fraud and common law conspiracy to defraud.  "The essential elements of a cause of action in fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Wallenta v. Moscowitz,  81 Conn.App. 213, 219 (Conn.App. 2004).  The intentional withholding of information for the purpose of inducing action can constitute fraudulent misrepresentation.  Pacelli Bros. Transp., Inc. v. Pacelli, 189 Conn. 401, 407 (Conn. 1983).

"The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the

plaintiff." Harp v. King, 266 Conn. 747, 779 (2003)(internal quotation marks omitted.). "[T]here is no independent claim of civil conspiracy. Rather, [t]he action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." Larobina v. McDonald, 274 Conn. 394, 408 (Conn. 2005).

But for the degree of particularity in their pleadings, the plaintiffs' pleadings sufficiently assert claims for fraud and conspiracy to defraud. For the reasons discussed above, the plaintiffs' fraud claim is upheld in part and dismissed in part, and the plaintiffs may replead the dismissed basis of their fraud claim. As the allegations of fraud form the basis for the plaintiffs' conspiracy claim, the conspiracy claim is likewise upheld in part and dismissed in part, without prejudice to replead.

### 7.   Constructive Trust

Plaintiffs assert a claim for a constructive trust against the moving defendants in their seventh cause of action. "[A] constructive trust arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113 (Conn.,1996). "In order for a constructive trust to be imposed, the plaintiff must allege fraud, misrepresentation, imposition, circumvention, artifice or concealment, or abuse of confidential relations." Giulietti v. Giulietti, 65

Conn.App. 813, 860 (Conn.App. 2001)(citing <u>Worobey v. Sibieth</u>, 136 Conn. 352, 356 (1949).  "Courts may use the equitable device of a constructive trust to remedy the unjust enrichment which results from not disposing of property as promised after the promise induced someone with whom the promisor shared a confidential relationship to transfer the property to the promisor."  <u>Id.</u> (citing <u>Starzec v. Kida</u>, 183 Conn. 41, 49 (1981)).

The plaintiffs allege that the moving defendants, by executing, through their fraudulent misrepresentations and omissions, their conspiracy to divert funds from Debit Direct, have unjustly enriched themselves to the exclusion of the plaintiffs in contravention to the fiduciary duties they owed to the plaintiffs.  As discussed above, the plaintiffs have sufficiently alleged a factual basis that the Debit Direct defendants each owed fiduciary duties to the plaintiffs.  The plaintiffs have also, on the basis of such duties, stated a claim for unjust enrichment.  Thus the plaintiffs appear to have stated a claim for constructive trust.

The defendants argue that constructive trusts are not available where the property that the plaintiffs seek is money that has not been traced or segregated from other funds.  The defendants cite several federal precedents for this proposition.  <u>See Great-West Life & Annuity Ins v. Knudson</u>, 534 U.S. 204, 213-14 (2002)("[W]here the property sought to be recovered or its proceeds have been dissipated so that no product remains . . . the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant."); <u>United States v. Peoples Benefit Life Ins. Co.</u>, 271 F.3d 411, 416 n.4 (2d Cir. 2001)("[I]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property

into a product in the hands of the wrongdoer.").  However, Connecticut courts do not seem to apply this "tracing" requirement in their own treatment of constructive trusts. See e.g., Macomber v. Travelers Prop. and Cas. Corp., 261 Conn. 620, 634 (2002)(noting possibility that trial court could impose constructive trust for reduced value of plaintiffs' annuities); Spector v. Konover, 57 Conn.App. 121, 132 (2000)(finding plaintiff entitled to constructive trust over the "profits the defendants received through improper use of partnership funds.").  Thus the ability to trace the plaintiffs' investment is not a bar to the plaintiffs' claims at this stage.

### 8.    Negligent Misrepresentation

In their eighth cause of action, the plaintiffs assert a claim for negligent misrepresentation against the Debit Direct defendants.  "One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."  Burnham v. Karl and Gelb, P.C., 50 Conn.App. 385, 390 (Conn.App. 1998) (quoting Restatement Second of Torts, § 552 (1979)).  "Falsity is an essential element of a negligent misrepresentation claim, and [the plantiff] bears the burden of demonstrating that the defendants made certain representations . . . that were in fact untrue."  Daley v. Aetna Life and Cas. Co., 249 Conn. 766, 792-93 (Conn. 1999).

The plaintiffs allege that they suffered damages as a proximate result of the Debit Direct defendants' material misrepresentations concerning Debit Direct.  While the defendants argue that the plaintiffs have not identified the misrepresentations with

sufficient particularity to state a claim of fraud, the false statements an element of

negligent misrepresentation do not have to be stated with the same degree of

particularity to sur vive a motion to dismiss.[12]   As with the plaintiffs' other claims

regarding the misrepresentations made by the Debit Direct defendants, the plaintiffs'

claim is dismissed without prejudice to replead.

### 9.   Breach of Fiduciary Duty

The plaintiffs assert a claim for breach of fiduciary duty against O'Halloran,

Butterworth, and Kelly in their ninth cause of action.  The defendants argue that

---

[12]   The court is aware that the Second Circuit, citing district court holdings, and district courts within the Second Circuit, have applied Rule 9(b) to claims of negligent misrepresentation.  Aetna Casualty and Surety Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583 (2005)(citing In re Leslie Fay Cos., Inc. Securities Litig., 918 F.Supp. 749, 767 (S.D.N.Y. 1996); Pitten v. Jacobs, 903 F.Supp. 749, 767 (D.S.C. 1995)); Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 188 (2d Cir. 2004)(noting that district courts have applied Rule 9(b) to negligent representation claims); see also Osrecovery, Inc. v. One Groupe Int'l, Inc., 354 F.Supp.2d 357, 380 (S.D.N.Y. 2005); Fagan v. Amerisourcebergen Corp., 356 F.Supp.2d 198, 218 (E.D.N.Y. 2004); Siemens Westinghouse Power Corp. v. Dick Corp., 299 F.Supp.2d 242, 246 (S.D.N.Y. 2004).  District courts in Connecticut have also cited cases from the Southern District of New York for the proposition that Rule 9(b) applies to claims of negligent misrepresentation.  See Catalano v. Bedford Asscs., Inc., 9 F.Supp.2d 133, 136 (D.Conn. 1998)(citing Simon v. Castello, 172 F.R.D. 103, 105 (S.D.N.Y. 1997); see also Yurevich v. Sikorsky Aircraft Division, 51 F.Supp.2d 144, 152 (D.Conn. 1999)(citing Catalano).  However, the Southern District cases on which the Second Circuit in Aetna Casualty and the Connecticut district courts rely involve applications of New York's law of negligent misrepresentation.  As the court in Aetna Casualty noted, the New York tort of negligent misrepresentation requires a showing that the misrepresentation was made for "the very purpose of inducing action."  404 F.3d at 583.  This intent element does not have an analog in Connecticut's law of negligent misrepresentation.  See Daley, 249 Conn. at 793("[The plaintiff] need not prove that the representations made by the defendants were promissory, but only that they contained false information.") Thus, the court finds that Rule 9(b) does not apply to claims of negligent misrepresentation under Connecticut law, as they are not allegations of fraud, and that the cases within the Second Circuit applying Rule 9(b) to New York claims of negligent misrepresentation are inapplicable.  If the Second Circuit finds otherwise, the court will revisit the issue on summary judgment.

fiduciary duties are not typically owed by a corporation to a prospective investor in an arms-length transaction.  As discussed above, the facts, as plead by the plaintiffs, are sufficient to support the conclusion that the plaintiffs entered into a joint venture with the Debit Direct defendants such that they had fiduciary duties directly to the plaintiffs.  The plaintiffs have sufficiently alleged that their actions constituted a breach of such duties, if they existed.  Accordingly, the defendants' motion to dismiss this claim is denied.

### 10.  Declaratory Relief

The plaintiffs, in their tenth cause of action, seek a declaration that they do not have any further obligations to the defendants under the November 2003 Memorandum, and that the defendants are liable to them for the amount of the sums paid to them by the plaintiffs.  The defendants have not specifically argued why this claim should be barred.  The court notes that the determination of remedies is not appropriate at this stage of the litigation and denies the defendants' motion as to this claim.

### 11.  Breach of the Covenant of Good Faith and Fair Dealing

In their eleventh cause of action, the plaintiffs assert a claim against O'Halloran, Butterworth, and Kelly for breach of the implied covenant of good faith and fair dealing. The defendants argue that there are no allegations in the plaintiffs' complaint that a contract existed between the plaintiffs and Butterworth or Kelly.  "The existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing."  Hoskins v. Titan Value Equities Group, Inc.  252 Conn. 789, 793 (Conn. 2000).  Therefore, this cause of action is dismissed as against

Butterworth and Kelly without prejudice to replead.

## III.   CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss the plaintiffs' complaint is GRANTED in part and DENIED in part.  The complaint is dismissed in its entirety as against defendants Skanco, Kennedy, Restart, Lloyd and Kermode.  The plaintiffs' fraud-based claims and implied covenant of good faith claims are dismissed in part without prejudice to the plaintiffs to replead within 21 days.  The plaintiffs' CUTPA claims are dismissed in their entirety.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 29th day of September, 2005.


_____/s/ Janet C. Hall_____
                         Janet C. Hall
                         United States District Judge